**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CH ACQUISITIONS 2, LLC, | |
|        Plaintiff-Counterclaim Defendant, | Civil Action No. 1:16-cv-02030-RJS |
|   -against- | |
| AQUILA AVIATION L.P. and WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION | |
|       Defendants-Counterclaim Plaintiffs, | |
| INSURED AIRCRAFT TITLE SERVICE, INC. | **ANSWER AND COUNTERCLAIMS OF DEFENDANTS-COUNTERCLAIM PLAINTIFFS AQUILA AVIATION L.P. AND WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION** |
|     Nominal Defendant. | |

Defendant-Counterclaim Plaintiff Aquila Aviation L.P. ("Aquila" or "Trustor") and Defendant-Counterclaim Plaintiff Wells Fargo Bank Northwest, National Association ("Wells Fargo" or "Owner Trustee"), by their undersigned counsel, as and for their answer to the Complaint of Plaintiff-Counterclaim Defendant CH Acquisitions 2, LLC ("CH" or "Purchaser"), respectfully state as follows, upon knowledge as to themselves and their own acts and upon information and belief as to all other matters:

## ANSWER

## NATURE OF THIS ACTION

1.     State that the allegations in Paragraph 1 of the Complaint purport to describe the claims that CH seeks to bring, to which no response is necessary, and deny the

allegations in Paragraph 1 of the Complaint, including denial of the allegation that the Aircraft Purchase Agreement dated January 15, 2016 (the "Purchase Agreement"), attached as Exhibit A, was terminated as of right and denial of the allegation that any inspection of the aircraft in question determined that it was not airworthy.

2.      State that the allegations in Paragraph 2 of the Complaint purport to state legal conclusions to which no response is necessary, state that Aquila and Wells Fargo did not agree to the release of the $1,500,000 deposit, and deny the balance of the allegations in Paragraph 2 of the Complaint.

## THE PARTIES

3.      Upon information and belief, admit that CH is a Delaware limited liability company, with an address 2220 Biscayne Boulevard, Miami, FL 33137, and deny knowledge or information sufficient to form a belief as to the truth of the balance of the allegations in Paragraph 3 of the Complaint.

4.      Admit that Aquila is a limited partnership organized under the laws of the British Virgin Islands and does not have an office in New York.

5.      Admit that Wells Fargo is a banking association organized under the laws of the United States of America, with an address 299 South Main Street MAC: U1228-051, Salt Lake City, Utah 84111, and state that Wells Fargo's main office is in Utah.

6.      Upon information and belief, state that Nominal Defendant Insured Aircraft Title Service, Inc. is a corporation incorporated under the laws of Delaware, with its principal place of business in Oklahoma City, Oklahoma.

## JURISDICTION AND VENUE

7.      State that Paragraph 7 of the Complaint, which purports to state that subject matter jurisdiction of this Court is based on diversity, is a legal conclusion to which no response is necessary, and upon information and belief, admit that diversity appears to exist among the parties.

8.      State that Paragraph 8 of the Complaint, which purports to state that personal jurisdiction of this Court is based on consent, is a legal conclusion to which no response is necessary, and admit that the parties have contractually consented to this Court's jurisdiction.

9.      State that Paragraph 9 of the Complaint, which purports to state that the venue is proper, is a legal conclusion to which no response is necessary, and admit that the venue is proper, and refer to Section 25 of the Purchase Agreement for a complete and accurate statement of the contract terms.

### Factual Allegations

10.      Admit the allegation in Paragraph 10 of the Complaint.

11.      Refer to Sections 1 and 2 of the Purchase Agreement for a complete and accurate statement of the contract terms, and deny the allegations in Paragraph 11 of the Complaint that are inconsistent with the terms of the Purchase Agreement, including denial of the allegation that characterizes all Defendants as the sellers of the aircraft in question.

12.      Refer to Section 2.A of the Purchase Agreement for a complete and accurate statement of the contract terms, and deny the allegations in Paragraph 12 of the Complaint that are inconsistent with the terms of the Purchase Agreement.

13.      Refer to Section 6, Section 7, and Exhibit F of the Purchase Agreement for a complete and accurate statement of the contract terms, and deny the allegations in Paragraph 13 of the Complaint that are inconsistent with the terms of the Purchase Agreement, including denial of the allegations that mischaracterize the terms of the Purchase Agreement.

14.      Refer to Section 7.D of the Purchase Agreement for a complete and accurate statement of the contract terms, and deny the allegations in Paragraph 14 of the Complaint that are inconsistent with the terms of the Purchase Agreement.

15.      Refer to Sections 2 and 7 of the Purchase Agreement for a complete and accurate statement of the contract terms, deny the allegations in Paragraph 15 of the Complaint that are inconsistent with the terms of the Purchase Agreement, and admit that CH had an

obligation to wire the balance of the purchase price on the Delivery Date (as defined in the Purchase Agreement).

16.      Refer to Sections 7 and 29 of the Purchase Agreement for a complete and accurate statement of the contract terms, and deny the allegations in Paragraph 16 of the Complaint that are inconsistent with the terms of the Purchase Agreement.

17.      Deny that the inspection contemplated by the Purchase Agreement was completed.

18.      Upon information and belief, state that certain aspects of the inspection contemplated by the Purchase Agreement were undertaken by St. Aerospace San Antonio, L.P., and deny that the inspection contemplated by the Purchase Agreement was completed.

19.      Deny the allegations in Paragraph 19 of the Complaint.

20.      Refer to a letter sent by CH on or about February 18, 2016, attached as Exhibit B, for a complete and accurate statement of the letter's contents, and deny the allegations in Paragraph 20 of the Complaint except state that CH sent a letter on or about February 18, 2016.

21.      Refer to a letter sent by CH on or about February 18, 2016 for a complete and accurate statement of the letter's contents, and deny the allegations in Paragraph 21 of the Complaint, including the allegation that Aquila and Wells Fargo wrongfully sought to keep the $1,500,000 deposit for themselves in contravention of the Purchase Agreement.

22.      Deny the allegations in Paragraph 22 of the Complaint.

23.      Upon information and belief, admit the allegation in Paragraph 23 of the Complaint.

## CLAIM I — BREACH OF CONTRACT

24.      Repeat and reallege each of their responses to the allegations in Paragraphs 1 to 23 of the Complaint as if fully set forth herein.

25.     Refer to Section 7 of the Purchase Agreement for a complete and accurate statement of the contract terms, and deny the allegations in Paragraph 25 of the Complaint that are inconsistent with the terms of the Purchase Agreement.

26.     Refer to Sections 7 and 29 of the Purchase Agreement for a complete and accurate statement of the contract terms, and deny the allegations in Paragraph 26 of the Complaint that are inconsistent with the terms of the Purchase Agreement.

27.     Deny the allegations in Paragraph 27.

28.     Deny the allegations in Paragraph 28.

29.     Deny the allegations in Paragraph 29.

## CLAIM II — DECLARATORY JUDGMENT

30.     Repeat and reallege each of their responses to the allegations in Paragraphs 1 to 29 of the Complaint as if fully set forth herein.

31.     Refer to Section 7 of the Purchase Agreement for a complete and accurate statement of the contract terms, and deny the allegations in Paragraph 31 of the Complaint that are inconsistent with the terms of the Purchase Agreement.

32.     Refer to Section 7 of the Purchase Agreement for a complete and accurate statement of the contract terms, and deny the allegations in Paragraph 32 of the Complaint that are inconsistent with the terms of the Purchase Agreement.

33.     Deny the allegations in Paragraph 33 of the Complaint.

34.     State that Paragraph 34 of the Complaint is CH's description of its own claim, to which no response is necessary, deny the allegations that CH properly terminated the Purchase Agreement, and deny the allegation that CH is entitled to a return of the deposit.

35.     State that Paragraph 35 of the Complaint is CH's purported description of Aquila and Wells Fargo's claims to which no response is necessary, state that Aquila and Wells Fargo claim, among other things, that CH has not properly terminated the Purchase Agreement, and deny the balance of the allegations in Paragraph 35 of the Complaint.

36.     Admit the allegation in Paragraph 36 of the Complaint.

37.     State that Plaintiff seeks a declaratory judgment from the Court, and deny the balance of the allegations in Paragraph 37 of the Complaint.

## CLAIM III — DECLARATORY JUDGMENT

38.     Repeat and reallege each of their responses to the allegations in Paragraphs 1 to 37 of the Complaint as if fully set forth herein.

39.     Refer to Section 7 of the Purchase Agreement for a complete and accurate statement of the contract terms, and deny the allegations in Paragraph 39 of the Complaint that are inconsistent with the terms of the Purchase Agreement.

40.     Refer to Section 7 of the Purchase Agreement for a complete and accurate statement of the contract terms, and deny the allegations in Paragraph 40 of the Complaint that are inconsistent with the terms of the Purchase Agreement.

41.     Deny the allegations in Paragraph 41 of the Complaint.

42.     Refer to a letter sent by CH on or about February 18, 2016 for a full and accurate statement of the letter's contents, and deny the balance of the allegations in Paragraph 42 of the Complaint

43.     State that Aquila and Wells Fargo have, as agreed under the terms of the Purchase Agreement, tendered the aircraft in question for delivery, and deny the balance of the allegations in Paragraph 43 of the Complaint

44.     State that an actual and justiciable controversy exists as to the rights and obligations of the parties under the Purchase Agreement.

45.     State that Plaintiff seeks a declaratory judgment from the Court, deny the balance of the allegations in Paragraph 45 of the Complaint, state that the remainder of the Complaint is CH's prayer for relief to which no response is necessary, and deny that CH is entitled to the requested relief.

## GENERAL DENIAL

46.     To the extent not expressly admitted herein, Aquila and Wells Fargo deny each and every other allegation, express or implied, contained in the Complaint.

## AFFIRMATIVE DEFENSES

47.     Aquila and Wells Fargo assert the following affirmative defenses, without assuming the burden of proof of such defenses that would otherwise rest on CH.  Aquila and Wells Fargo reserve the right to amend or supplement their answer, their defenses, and counterclaims.

### FIRST AFFIRMATIVE DEFENSE

48.     The Complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

49.     Aquila and Wells Fargo were excused from performance due to CH's breaches of contract.

### THIRD AFFIRMATIVE DEFENSE

50.     CH's claims are barred because CH breached its duty of good faith and fair dealing.

### FOURTH AFFIRMATIVE DEFENSE

51.     CH's claims are barred, in whole or in part, by the doctrine of waiver.

### FIFTH AFFIRMATIVE DEFENSE

52.     CH's claims are barred by the doctrine of estoppel.

### SIXTH AFFIRMATIVE DEFENSE

53.     CH's claims are barred, in whole or in part, by the doctrine of unclean hands.

### SEVENTH AFFIRMATIVE DEFENSE

54.     CH has failed, in whole or in part, to mitigate its alleged damages.

## EIGHTH AFFIRMATIVE DEFENSE

55.    Any injury suffered by CH resulted from its own conduct, the conduct of non-parties, or other causes besides the acts and occurrences alleged in the Complaint.

## NINTH AFFIRMATIVE DEFENSE

56.    Conditions precedent for a proper termination of the Purchase Agreement had not been satisfied.  Upon information and belief, the inspection provided for in the Purchase Agreement was not completed.

## TENTH AFFIRMATIVE DEFENSE

57.    CH's claims are barred because CH denied Aquila and Wells Fargo an opportunity to cure any alleged issues with the aircraft in question.

## ELEVENTH AFFIRMATIVE DEFENSE

58.    Aquila and Wells Fargo reserve the right to raise any other affirmative defenses not asserted herein of which they become aware through discovery or other investigation.

WHEREFORE, Aquila and Wells Fargo respectfully request that this Court:

(i) dismiss the Complaint with prejudice;

(ii) enter a judgment awarding Aquila and Wells Fargo the costs and disbursements of this action, including attorneys' fees; and

(ii) grant such further and other relief as this Court deems just and proper.

## COUNTERCLAIMS

Defendant-Counterclaim Plaintiff Aquila and Defendant-Counterclaim Plaintiff Wells Fargo bring their counterclaims against Plaintiff-Counterclaim Defendant CH and allege as follows, upon knowledge as to themselves and their own acts and upon information and belief as to all other matters:

### NATURE OF THE ACTION

1.      This is a contract dispute arising from an agreement for the sale of a private aircraft.  CH agreed to purchase the Aircraft (as defined below) from Aquila.  Wells Fargo is a party to the sale only in its capacity as the owner trustee of the Aircraft, not in its individual capacity.  Nominal Defendant Insured Aircraft Title Service, Inc. ("IATS" or "Escrow Agent") is the escrow agent for the transaction.  On January 15, 2016, the parties entered into the Purchase Agreement, which provided for CH's purchase of the Aircraft for the price of $27,725,000.00.

2.      Despite the satisfaction by Aquila and Wells Fargo of all conditions of the Purchase Agreement, including being ready, willing, and able to deliver the Aircraft, CH breached the terms of the Purchase Agreement by refusing to accept delivery of the Aircraft. CH's stated reason for its nonperformance was that the Aircraft supposedly had "airworthiness discrepancies" and "major damage."  CH's claim is simply manufactured in an effort to avoid its contractual obligations.  CH failed to provide any basis whatsoever for its conclusory assertion that the Aircraft had those discrepancies.  Despite Aquila's repeated attempts to discuss the supposed discrepancies of the Aircraft, CH flatly refused, and continues to refuse, to identify the supposed discrepancies on the Aircraft that CH believed to be "airworthiness discrepancies" or "major damage."  CH's apparent change of heart reflects nothing more than buyer's remorse, and CH's regret does not excuse its failure to adhere to the terms of the Purchase Agreement. Accordingly, Aquila and Wells Fargo respectfully request that the Court award damages and declaratory judgment for Aquila and Wells Fargo for CH's breach of the Purchase Agreement.

## PARTIES

3.     Defendant-Counterclaim Plaintiff Aquila is a limited partnership organized under the laws of the British Virgin Islands.  Aquila has two members: one general partner and one limited partner.  The general partner of Aquila is a citizen of the United Kingdom.  The limited partner of Aquila is a citizen of the United Kingdom and the United Arab Emirates.  Thus, for the purposes of diversity jurisdiction, Aquila is a citizen and a subject of foreign states.  Aquila's address is Level 3, Legatum Plaza, DIFC, PO Box 506625, Dubai, United Arab Emirates.  Aquila is a party to the Purchase Agreement, in its capacity as the trustor under a trust agreement (the "Trust Agreement") with Wells Fargo, dated September 10, 2007.

4.     Defendant-Counterclaim Plaintiff Wells Fargo is a banking association organized under the laws of the United States.  Wells Fargo maintains its main office in Utah.  Thus, for the purposes of diversity jurisdiction, Wells Fargo is a citizen of Utah.  Wells Fargo's address is 299 South Main Street 5th Floor, MAC: U1228-051, Salt Lake City, Utah 84111.  Wells Fargo is a party to the Purchase Agreement as the seller in its capacity as the owner trustee of the Aircraft under the Trust Agreement and not in its individual capacity.

5.     Upon information and belief, Plaintiff-Counterclaim Defendant CH is a limited liability company organized under the laws of Delaware and maintains an office at 2220 Biscayne Boulevard, Miami, Florida 33137.  Upon information and belief, members of CH are three trusts.  Upon Information and belief, members of those three trusts are citizens of New York and Florida.  Upon information and belief, no member of CH is a citizen of a foreign state, Delaware, Oklahoma, or Utah.  Thus, for the purposes of diversity jurisdiction, CH is a citizen of New York and Florida.  CH is a party to the Purchase Agreement as the purchaser.

6.     Upon information and belief, Nominal Defendant IATS is a corporation incorporated under the laws of Delaware, with the principal place of business in Oklahoma City, Oklahoma, with an office at 4848 SW 36th Street, Oklahoma City, Oklahoma 73179.  Under the Purchase Agreement, Nominal Defendant IATS is the escrow agent.

## JURISDICTION AND VENUE

7.     This Court has personal jurisdiction over the parties because the parties contractually consented to jurisdiction of this Court.  *See* Purchase Agreement § 25.

8.     This Court has subject matter jurisdiction over the counterclaims asserted by Aquila and Wells Fargo under 28 U.S.C. § 1332.  Diversity jurisdiction exists because this action involves a dispute among citizens of different states and a citizen of foreign states.  The amount in controversy exceeds $75,000.  This Court has subject matter jurisdiction over Aquila and Wells Fargo's counterclaims also under 28 U.S.C. § 1367(a) because they are so related to CH's claims that they form part of the same case or controversy under Article III of the United States Constitution.

9.     Venue is proper in this district under 28 U.S.C. § 1391(b)(3).  There is no district in which Aquila and Wells Fargo may otherwise assert their counterclaims as provided in 28 U.S.C. § 1391(b).  *See* Purchase Agreement § 25.

## STATEMENT OF FACTS

### A.      The Purchase Agreement's Terms

10.     CH (Purchaser), Aquila (Trustor), Wells Fargo (Seller, not in its individual capacity but in its capacity as Owner Trustee) and IATS (Escrow Agent) executed the Purchase Agreement on January 15, 2016.

11.     Under the Purchase Agreement, CH agreed to purchase the following:

a.     one Boeing Business Jet 737-7CG, bearing serial number 30751 and registration number N737L;

b.     two aircraft engines, one bearing serial number 874966 and another bearing serial number 876101;

c.     one Honeywell 131-9B Auxiliary Power Unit;

d.     log books, manuals, maintenance records, and other documents listed under Section 1 of the Purchase Agreement; and

> e.      radios, navigational devices, and other items listed under Section 1 and Exhibit A of the Purchase Agreement (all of the foregoing collectively, the "Aircraft").

*See* Purchase Agreement § 1; Purchase Agreement Ex. A.

12.      In exchange for the Aircraft, CH agreed to pay $27,725,000.00 (the "Purchase Price").  *See* Purchase Agreement § 2.

13.      CH placed a deposit in the sum of $1,500,000.00 in an escrow account (the "Deposit") maintained by IATS.

14.      CH agreed that the Deposit would be paid to Wells Fargo (Owner Trustee) in the event that CH failed to take delivery of the Aircraft "and pay the remainder of the Purchase Price . . . following proper tender of the Aircraft in the condition required" under the Purchase Agreement:

> Subject to the terms and conditions of this Agreement, *the Deposit shall be* (i) *paid to Seller* as liquidated damages should Purchaser *fail to take delivery* of the Aircraft *and pay the remainder of the Purchase Price* when required to do so hereunder following proper tender of the Aircraft in the condition required hereby and otherwise in accordance with the provisions of Section 29 hereof; (ii) applied in partial satisfaction of Purchaser's obligations to pay the Purchase Price of the Aircraft; or (iii) returned to Purchaser should either (a) Seller fail to perform its obligations in accordance with the terms of this Agreement or (b) as required in accordance with Sections 7 or 29 hereof.

*See* Purchase Agreement § 2.A (emphasis added).

15.      The Purchase Agreement also provided a list of steps to be taken, which would comprise a full inspection of the Aircraft.  The inspection included, but was not limited to, a ground inspection by a third party inspection facility (the "Inspection Facility") and a test flight.  *See* Purchase Agreement § 7; Purchase Agreement Ex. F.

16.      Under the Purchase Agreement, CH agreed to bear all costs of the inspection absent one of (i) default, (ii) failure to deliver the Aircraft, or (iii) "Major Items" found during the inspection:

> Except as expressly set forth herein to the contrary, *all costs and expenses related to the pre-purchase inspection* (including, without limitation, the costs and expenses of the Inspection Facility related thereto) *shall be borne by Purchaser*; provided that, Seller shall indemnify and reimburse Purchaser for all such costs and expenses *in the event Seller defaults or otherwise fails to deliver the Aircraft* to Purchaser hereunder (unless such failure is solely attributable to a breach by Purchaser of its obligations hereunder) *or in the event any Major Items* are found during the pre-purchase inspection or review of the Aircraft Documents.

*See* Purchase Agreement § 7.A (emphasis added).

17.     Under the Purchase Agreement, after completing the inspection, CH could reject the Aircraft only if the inspection uncovered "airworthiness discrepancy," "major corrosion," or "major damage":

> *Upon completion of the Inspection*, Purchaser shall either (i) accept the Aircraft, subject to no corrective work being performed on the same, by execution and delivery of the Confirmation of Aircraft Acceptance (ii) accept the Aircraft, subject to Seller's correction of airworthiness discrepancy items listed in the Confirmation of Aircraft Acceptance, or (iii) reject the Aircraft but *only in the event any airworthiness discrepancy, major corrosion, or major damage* (including, without limitation, damage history to the airframe, any engine or material part, missing logs and/or records or failure to comply with the Aircraft Specifications attached hereto as Exhibit A) is found during the Inspection. Purchaser shall notify Seller of its decision in writing no later than three (3) business days after receipt by Purchaser and Seller of the Inspection Facility's written results of the Inspection.

*See* Purchase Agreement § 7.D.

**B.     CH's Refusal to Perform**

18.     At all relevant times, the Aircraft did not have "any airworthiness discrepancy, major corrosion, or major damage."

19.     Upon information and belief, the inspection contemplated by the Purchase Agreement had not been completed when CH purported to terminate the Purchase Agreement. To the extent that some parts of the inspection had been completed, they revealed no "airworthiness discrepancy, major corrosion, or major damage."  Rather, as a used aircraft that

was about sixteen-years-old, the Aircraft had the ordinary issues that were all remedied after identification.

20.     To this day, CH has not identified any discrepancy on the Aircraft that amounts to "airworthiness discrepancy, major corrosion, or major damage."

21.     To this day, CH has not provided any basis for CH's claim that the Aircraft had "any airworthiness discrepancy, major corrosion, or major damage."

22.     The Inspection Facility conducted a ground inspection of the Aircraft and did not identify "any airworthiness discrepancy, major corrosion, or major damage."

23.     At all relevant times, CH knew that the Aircraft was used.

24.     Although the parties had identified minor issues to be remedied on the Aircraft during the initial stage of the pre-purchase inspection, the Inspection Facility did not identify those minor discrepancies as "airworthiness discrepancy, major corrosion, or major damage."

25.     When Aquila notified CH for the first time that those minor discrepancies were being corrected, CH did not characterize any of those minor discrepancies as "airworthiness discrepancy, major corrosion, or major damage."

26.     Upon information and belief, after the ground inspection by the Inspection Facility, rather than pointing out any discrepancy amounting to "airworthiness discrepancy, major corrosion, or major damage," CH's representative expressed no specific concern, voiced no issue regarding the Aircraft, and said that CH was working on the acceptance.

27.     Subsequently, however, recognizing that it was contractually required to close on the Purchase Agreement given the lack of any major issue with the Aircraft, CH sought to repudiate its contractual obligations.

28.     Even though the Purchase Agreement allowed rejection of the Aircraft only after the completion of the inspection contemplated by the Purchase Agreement, *see* Purchase Agreement § 7.D, before the inspection was completed, on or about February 18, 2016,

CH sent to Aquila and Wells Fargo a letter (the "Rejection Letter").  A copy of the Rejection Letter is attached as Exhibit B.

29.     On the Rejection Letter, CH stated its conclusory contention that the Aircraft "ha[d] airworthiness discrepancies and major damage (as defined in the Agreement)." CH also sent a copy of the Rejection Letter to Escrow Agent, requesting Escrow Agent to release the Deposit.

30.     The Rejection Letter did not identify what discrepancies, if any, amounted to "airworthiness discrepancies" or "major damage."  The Rejection Letter did not characterize as "airworthiness discrepancy" or "major damage" any of the minor discrepancies that the parties had previously identified.

31.     After receiving the Rejection Letter, Aquila invited CH and CH's technical advisors to discuss the basis for CH's claim that the Aircraft had "airworthiness discrepancies and major damage."

32.     Aquila also requested CH to provide a list of items that amounted to "airworthiness discrepancies and major damage," and offered to remedy any discrepancies on the Aircraft.

33.     Sometime after receiving the Rejection Letter, Aquila's representative asked CH's representative whether CH still planned to purchase the Aircraft subject to the Aircraft's supposed "airworthiness discrepancies and major damage" being fixed.  CH's representative replied that he or she did not know.

34.     Although Aquila's technical advisors made multiple attempts to contact CH's technical advisors, CH's technical advisors failed to respond.

35.     Aquila contacted CH and explained that CH appeared to be rejecting the Aircraft for disingenuous reasons, and that Aquila was not aware of any "airworthiness discrepancy" or "major damage" on the Aircraft.  And again, Aquila offered to remedy any discrepancies that CH would identify on the Aircraft.

36.     Despite Aquila's repeated attempts, CH consistently refused to discuss the basis of CH's claim that the Aircraft had "airworthiness discrepancies and major damage."

37.     On February 23, 2016, CH sent a letter to Aquila and Wells Fargo stating that Aquila and Wells Fargo were in breach of the Purchase Agreement because the Deposit had not been returned to CH.  A copy of the February 23, 2016 letter from CH is attached as Exhibit C.  Again, CH did not identify in its February 23, 2016 letter which discrepancies, if any, on the Aircraft amounted to "airworthiness discrepancies" or "major damage."

38.     On March 5, 2016, Aquila notified CH that the Aircraft was ready and available for the test flight contemplated under the Purchase Agreement, and that all previously identified minor discrepancies had been rectified.  A copy of Aquila's March 5, 2016 notice is attached as Exhibit D.

39.     On March 8, 2016, CH sent Aquila a letter reiterating the allegations in the Rejection Letter that the Aircraft had "airworthiness discrepancies and major damage" — again, without providing any basis whatsoever for CH's claim that the Aircraft had those discrepancies. A copy of CH's March 8, 2016 letter from CH is attached as Exhibit E.  CH stated on the March 8, 2016 letter that CH disagreed with Aquila that any discrepancies found during the initial stage of the pre-purchase inspection were minor — again, without identifying which of the discrepancies amounted to "airworthiness discrepancy" or "major damage."

40.     On March 16, 2016, Aquila responded to CH's March 8, 2016 letter, explaining that CH's unwillingness to discuss with Aquila and its technical advisors the Aircraft's supposed "airworthiness discrepancies and major damage" evidenced CH's failure to act in good faith in performing CH's obligations under the Purchase Agreement.  The March 16, 2016 letter is attached as Exhibit F.

41.     On the same letter, Aquila notified CH that Aquila planned to tender the Aircraft at the Inspection Facility as contemplated under the Purchase Agreement and provided a date and time for the proposed tender of the Aircraft.

C. **CH's Demand for Costs for Inspecting the Aircraft**

42. On March 17, 2016, CH sent Escrow Agent a letter demanding that the Deposit be released to pay for the expenses that CH supposedly incurred for an inspection of the Aircraft. The March 17, 2016 letter to Escrow Agent is attached as Exhibit G. In that letter, CH did not explain the basis for CH's claim that the Deposit should be used to cover CH's expenses for inspecting the Aircraft. Again, CH did not explain the basis for its claim that the Aircraft had "airworthiness discrepancies and major damage." On the same day, CH sent Aquila a letter reiterating the false assertion that the Aircraft had "airworthiness discrepancies and major damage." CH's March 17, 2016 letter to Aquila is attached as Exhibit H.

43. On the next day, March 18, 2016, Aquila responded to CH's March 17, 2016 letter and explained that the Purchase Agreement did not permit the Deposit to be used to cover the costs for CH's inspection of the Aircraft. A copy of Aquila's March 18, 2016 letter is attached as Exhibit I.

D. **Tender of the Aircraft and CH's Refusal to Accept Delivery**

44. On March 18, 2016, Aquila made the Aircraft available for delivery at the Inspection Facility.

45. On March 18, 2016, CH was not present at the Inspection Facility to accept delivery of the Aircraft. CH failed to wire the Purchase Price or instruct Escrow Agent to wire the Deposit to Aquila or Wells Fargo, despite the timely notice of the Aircraft's location and availability for delivery.

46. Instead of accepting delivery of the Aircraft, CH commenced this action on March 18, 2016.

47. On March 21, 2016, Aquila notified CH that CH was in breach of the Purchase Agreement as a result of CH's failure to tender the Purchase Price and accept delivery of the Aircraft. A copy of Aquila's March 21, 2016 letter is attached as Exhibit J.

48. Upon information and belief, in April 2016, shortly after its purported rejection of the Aircraft, CH purchased a different Boeing Business Jet at a lower price.

17

## FIRST CAUSE OF ACTION

## <u>BREACH OF CONTRACT</u>

49.     Aquila and Wells Fargo repeat and reallege each of the allegations made in Paragraphs 1 through 48 hereof, as if fully stated herein.

50.     The Purchase Agreement did not permit CH to reject the Aircraft unless (i) the inspection of the Aircraft was completed, and (ii) the inspection actually found "airworthiness discrepancies," "major corrosion," or "major damage."   *See* Purchase Agreement §7.D.

51.     Neither of these two conditions had been satisfied.  Based on information and belief, the inspection was not completed when CH purported to terminate the Purchase Agreement and no "airworthiness discrepancies," "major corrosion," or "major damage" was found.

52.     CH's conclusory declaration that the Aircraft supposedly had "airworthiness discrepancies and major damage" — without identifying a single discrepancy, providing any detail, or explaining the basis for CH's claim that such discrepancies existed — did not excuse CH's performance under the Purchase Agreement.

53.     Although Aquila and its technical advisors repeatedly invited CH and CH's technical advisors to discuss what discrepancies, if any, amounted to "airworthiness discrepancies and major damage," CH and CH's technical advisors failed to identify any supposed discrepancies that amounted to "airworthiness discrepancies and major damage."

54.     Indeed, CH appears to have been represented by some three law firms since February 2016, but not one of CH's counsel articulated even a minimally substantiated theory how the Aircraft had "airworthiness discrepancies and major damage."  Rather, all of CH's counsel repeated CH's conclusory contention that the Aircraft had "airworthiness discrepancies and major damage," without providing any basis.

55.     Aquila and Wells Fargo tendered the Aircraft as the parties agreed under the Purchase Agreement.

56.     After CH refused to accept delivery of the Aircraft, Aquila and Wells Fargo sought to mitigate the damages suffered by seeking to sell the Aircraft.  Despite the reasonable effort to sell the Aircraft at a reasonable price, Aquila and Wells Fargo have been unable to sell the Aircraft.

57.     CH to this day has not identified a single discrepancy on the Aircraft that amounts to "airworthiness discrepancy" or "major damage."

58.     By reason of the foregoing, Aquila and Wells Fargo have suffered and continue to suffer damages in an amount to be determined at trial, including but not limited to the Purchase Price.

## SECOND CAUSE OF ACTION

## <u>BREACH OF CONTRACT</u>

59.     Aquila and Wells Fargo repeat and reallege each of the allegations made in Paragraphs 1 through 48 hereof, as if fully stated herein.

60.     Even if the Aircraft had any discrepancies and CH had identified those discrepancies — which Aquila and Wells Fargo deny — the existence of the discrepancies did not provide a basis for CH to terminate the Purchase Agreement.  CH was required to allow Aquila and Wells Fargo an opportunity to cure the discrepancies on the Aircraft.

61.     Aquila offered to cure any and all discrepancies on the Aircraft.

62.     CH failed to give Aquila and Wells Fargo an opportunity to cure any discrepancy on the Aircraft, so CH was not justified in suspension of its performance and CH was still bound to complete CH's performances under the Purchase Agreement.

63.     Aquila and Wells Fargo tendered the Aircraft as the parties agreed under the Purchase Agreement.

64.     CH refused to accept delivery of the Aircraft.

65.     By reason of the foregoing, Aquila and Wells Fargo have suffered and continue to suffer damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

## **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

66.    Aquila and Wells Fargo repeat and reallege each of the allegations made in Paragraphs 1 through 48 hereof, as if fully stated herein.

67.    The Purchase Agreement imposes on CH an implied obligation to act in good faith and deal fairly with Aquila and Wells Fargo in connection with the Purchase Agreement and the sale of the Aircraft.

68.    CH has frustrated the purpose of the Purchase Agreement by, among other things, completely abandoning CH's obligations under the Purchase Agreement.

69.    By reason of the foregoing, Aquila and Wells Fargo have suffered and continue to suffer damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

## **DECLARATORY JUDGMENT**

70.    Aquila and Wells Fargo repeat and reallege each of the allegations made in Paragraphs 1 through 48 hereof, as if fully stated herein.

71.    Under the Purchase Agreement, CH agreed to bear all costs of inspecting the Aircraft absent (i) default, (ii) failure to deliver the Aircraft, or (iii) "Major Items" found during the inspection.  *See* Purchase Agreement § 7.A.

72.    Wells Fargo did not default, nor did it fail to deliver the Aircraft.  No "Major Item" was found during the inspection.  Thus, the Deposit should be paid to Wells Fargo in full.

73.    A substantial and actual controversy exists with respect to whether CH's costs for inspecting the Aircraft should be paid from proceeds of the Deposit.

74.    By reason of the foregoing, Aquila and Wells Fargo seek a declaration that CH pay the costs for inspecting the Aircraft without the use of proceeds from the Deposit.

## PRAYER FOR RELIEF

**WHEREFORE**, Aquila and Wells Fargo respectfully request that this Court:

(i) enter a judgment awarding damages in the amount to be determined at trial, together with interest;

(ii) enter a declaratory judgment declaring that CH pay the costs for inspecting the Aircraft without the use of proceeds from the Deposit; and

(iii) grant such further and other relief as this Court deems just and proper.

Dated: New York, New York

April 20, 2016

**ALLEN & OVERY LLP**

By:  ___/s/ Jacob S. Pultman_____
Jacob S. Pultman

1221 Avenue of the Americas
New York, NY 10020
(212) 610-6300
jacob.pultman@allenovery.com

*Attorneys for Defendants-*
*Counterclaim Plaintiffs Aquila*
*Aviation L.P. and Wells Fargo Bank*
*Northwest, National Association*